May it please the court, my name is Frank Sabatino and I do represent the appellant. With the court's permission I would reserve four minutes for rebuttal. That's granted. We respectfully submit that the district court in this case committed three fundamental errors. First, the district court misread the Littlejohn opinion and in so doing mistakenly concluded that the traditional common law rule of successorship liability should apply in the context of a delinquency action under ERISA. Second, the district court failed to follow the Seventh Circuit's position in artistic furniture which we believe is fully consistent with the law of the Supreme Court and of this court. And third, because it applied the incorrect standard, the district court failed to recognize that as a matter of law, Ruberton should bear successorship liability under ERISA. Mr. Sabatino, am I correct that aside from how the district court ruled, both sides proceeded in this case as if artistic furniture was the applicable rule of law? Yes, Your Honor. In the briefs, in fact, the district court even said Littlejohn was raised sua sponte by the district court. And so you've changed your position somewhat on appeal. Well, we changed our position. We always thought that artistic furniture should apply. So we never changed our position. What happened was both parties relied on artistic furniture, which we want in this court. And the other side did not challenge artistic furniture. Okay, that's fair. So we believe that artistic furniture should be adopted. We've always followed that. Now, we actually believe, Judge Barry, that the rationale of Littlejohn does support us. And that is because the court in Littlejohn gave a methodology for applying the common law of ERISA. But the district court in its invocation of Littlejohn, I believe, characterized what's at stake here as an ordinary debt, didn't it? Well, yes. You're certainly not embracing that approach. Oh, no, never did. What happened was ordinary debt, which comes from page 209 of the Littlejohn opinion. What had happened was in Littlejohn, we were the plaintiffs in that case. And we sued, we being the fund. And we sued on the basis of a merger. And we said that there was liability. In that case, the other side relied on artistic furniture and Golden State bottling and said, you need pre-transaction notice for there to be liability, which hadn't existed in that case. Now, what happened there, Judge Smith, was that the court said that in an asset sale, you have a case where a plaintiff is suing one company under a collective bargaining agreement signed by the other company. You're suing the successor under contract signed by the predecessor. And they said that was not what was in Littlejohn. Littlejohn was merely an ordinary debt. But we are a case where we are suing one party, Ruberton, under a collective bargaining agreement that was signed by Statewide. And so, therefore, that is not an ordinary debt. And I think that the district court confused those two. How would artistic furniture change? How would the approach taken in artistic furniture change the result in this case? The district court, I believe, concluded that there was very little evidence, that there was little evidence of continuity, I believe. Oh, well, what would happen, there was tremendous continuity. Well, first of all, there's no doubt that there was notice. I think the record is very clear that the buyer knows. Well, your friends are arguing that, but I'm going to get them when they step up. Okay. But now, and as far as continuity, Judge Smith, I would point to the Supreme Court's decision in Fall River Dye. Now, in that case, the Supreme Court found continuity. There were a lot of differences between the businesses. One was much, the successor was much smaller than the buyer. There were different types of business that were done. And as in this case, people are saying, well, these are different businesses. It was an unsure labor practice case. It was. However, it cited golden state bottling for determining the successorship elements. So we would say that they are together. And what was so interesting in Fall River Dye, the Supreme Court said the reason why there was continuity in Fall River Dye, it said, first of all, you focus on the employees who went from the successor to the predecessor. And Fall River Dye says, would those employees view their positions as being unchanged by the transition? But here, wasn't the work that they did different? Oh, no, Judge Slocum. I mean, they were doing highway, but wasn't the actual work different? They were doing signage. They were doing guardrail. And they were doing signs. There had been some, our opponents make some talk about asphalt. But that is really a dead issue. The record, Mr. Sally, who had been the counsel for statewide, said, and we cited this in our brief, that the asphalt, the paving work, was a large piece of statewide business back in the 80s. But it had died by the 90s and certainly by the transition. And Judge Slobiter, I believe that in the year 2006, which was the first year after the asset sale, Ruberton's business consisted of $11.2 million in revenue. And of that, $8.9 million was highway work, which they got only from doing this purchase. Because before that time, they just did general construction on gas stations. So there is no doubt that all this work, all of these employees, they had, there were the same bargaining unit came over, eight of nine employees. They had the same union that they had before. They had the same collective bargaining agreement, which was assumed. And so these did not exist in Fall River Dine, so it's actually stronger than Fall River Dine. They had the same benefits from the same employee benefit plan that they had coming over. They had the same supervisors. And by the way, if there's any, page 154 of the joint appendix makes clear that they had the same supervisors, a Mr. Osvaldo Reyes and a Mr. James Kuhart. They had the same plant that they worked out of. They had the same equipment that was purchased. They had the same customer, which was the state of New Jersey making roads. That was the bulk of their work. Everything was the same. So I think that this case is stronger than Fall River Dine. It's certainly stronger than the Hawaii Carpenters case, which was a small... You say that if we were to say that Judge Irenas was right and the common law rule should be applied, you don't take issue with his finding of no continuity, that one of the exceptions applies, the continuous operations, correct? Yeah, I would say that we would not try to win this case under the traditional... And why is that? Is that because there's no commonality of ownership? Exactly. And is that a requirement for that exception? We cited the General Electric case, the traditional common law rules. See, the traditional common law rules, you can have a de facto merger of two companies which require commonality. You could have a disguise continuation, which would require a kind of commonality. You could have a fraud. You're gonna need one of these elements that shows it. But I'd say you're coming with quite persuasive evidence of the continuity of operations. One would think it could be applied to the common law rule as well to support the exception, but there is no commonality of ownership. So you would give up on that. Exactly. And Judge Barry, one of the reasons why the traditional common law rule was designed to require commonality of ownership, their theory being that they wanted to encourage the fluidity of corporate assets. Now, that's why the artistic furniture rule says, well, we still want to have fluidity of assets. That's why we require notice. We require notice. The theory being there that the purchaser, that purchaser has notice, they can make arrangements in the corporate purchase. And that could have happened here. It's interesting, because Judge Irenas did have some discussion whether there'd be no way to sell this company. Actually, you could have had a three-way deal in this case. I mean, if Mr. Rueber, I mean, the Rueberton people, the Baranatos said, look, we want to buy this company, but we don't want liability. We're gonna pay, I think it's $2.6 million, because they paid $1.6 million for the business and $1 million for the real estate. They knew where Mr. Einhorn was. They could have said, Mr. Einhorn, Mr. Smith, if Mr. Smith wants us to buy this, otherwise he's not gonna get any money. Mr. Einhorn wants us to buy it. We're gonna spend $2.6 million. We're not gonna spend any more. You decide how to decide it, just as long as we get a bill of sale and a release. That is the exact type of deal that Golden State Bottling, artistic furniture, and this court, in the Brzozowski opinion, thought should be done to allow the fluidity of corporate assets while protecting the employees. What would be the effect of a decision, of a reversal, on future costs? We know that we're talking about $500,000 due to the pension funds now, but what is the, you know, how much is it a year? Do we know how much it is a year? I mean. Oh, it depends on what the number of people working would be in the formula, the collective bargaining agreement. Now, they've been paying it going forward. It's a Ruberton- They have been. Yes, Ruberton- It's just the past. Yes, and that's why we think there's so clearly continuity. These employees are getting their benefits from this plan. Okay, thank you very much. Thank you. We'll hear from the Ruberton people. I'm John Landesman. My plea is the court, and I represent ML Ruberton Construction Company. I have 10 minutes of time. The question facing the court is, what successor liability standard should be applied under ERISA? What is the correct standard? And ERISA does not provide the answer, and so the court is, in this instance, required to fill in the gaps. The question is, should it be the traditional common law standard, which, as we heard earlier, encourages the fluidity of corporate assets and applies to ordinary debts, or should it be the exception to the rule, which is the Golden State Bottling Rule, which the Supreme Court has said, and the courts recognize, is, deviates from the common law rule and provides a more expansive view of successor liability, primarily to protect victimized employees. Why shouldn't we look to the policy underlying ERISA? And that is, that's really the question, Your Honor. Why shouldn't we look to it? And the answer is that, in this case, unlike in Golden State Bottling, which dealt with the National Labor Relations Act, and we have other cases that extend Golden State Bottling into Pregnancy Discrimination Act or Title VII, should it go to ERISA, where there's no victimized employee? Let's be clear, in this case, there is no victimized employee. I'm sorry, Judge Barry. You say that. That's right, because... I'm not sure your friend across the aisle would agree with you. Well, I believe that he would have to agree with me, because here, there are no individual participants or employees of Statewide, the predecessor, that are not going to receive their pension benefits. That's not what this case... Are you suggesting that the fund is actuarially in the same situation that it would have been in? I'm not... Had this back payment... No, the fund, as a result... Who's the beneficiary of the funds? Who's the beneficiary of the funds? The employees would receive the benefits, the employees who participate. Wouldn't it necessarily be less without the $500,000? Well, we're talking about a fund, and to take a step back... I know a fund. The fund that has over a billion dollars in net assets, and if Rupertine is not... Rupertine is a small, closely held company. If Rupertine... I just want to ask you about that. What do we know about Rupertine? I'm sorry to interrupt, but we couldn't find Rupertine online. We sometimes try to figure all that out. I have a map, and I can't find them when I go out to visit them. They're a small company. We're talking about a small family company. How many employees? What's their... The number of employees, I believe... More than 20, isn't it? It's going to be more than 20. I don't know the answer off the top of my head, but I believe it would be less than 50. It is not an extremely large company. I'm sorry, Judge Schloeter. I'd like to return you really to the first question that Judge Schloeter asked, which referred to the congressional policy judgment that is behind the very enactment of ERISA. You began your argument by saying this is about filling gaps. I don't think you really responded to the question based upon how you began your argument. Why does that congressional policy not serve as a gap filler here? Because the fund is not an employee, is not a victimized employee. The victimized employee is in a different position than the fund. The fund can conduct audits to avoid this sort of liability. A victimized employee can't. Well, Tom, what do you mean? I don't understand how an audit can avoid, I mean, the question is, do they get the $500,000 or not? Well, the $500,000 accrued over a long period of time. Okay, there's a victim here. You're saying that, but the victim, and one of the victims are the other employers who have to make up the shortfall for the employer who didn't pay, correct? In theory, that's correct. Or the benefits could be adjusted, or the investments in the funds could have a terrific year and there could be no shortfall. Well, why in theory? We don't know. I mean, any way you look at it, the fund is without the infusion of half a million dollars in cash that it otherwise would have received. What's theoretical about that? Well, the fund is shorted a half a million dollars. And the question is, should that half a million dollars be treated as an ordinary debt? And we look at the plain language of this Court's decision in Littlejohn, and it discusses filling in the gap in the context of a merger under ERISA and says that this is an ordinary debt. It is a debt that has its genesis in a collective bargaining agreement. This is not a merger. You concede that. This is not a merger. I would certainly concede that. But in Littlejohn, the Court was faced with the question, should we apply the Golden State Bottling Rule, the expansive rule under ERISA, or should we insert traditional common law? The Golden State Bottling Rule comes out of a case, unfair labor practice case, where one employee was unfairly discharged and the successor had to take him back. That's correct. You're talking here, I mean, I understand there's, maybe it's a distinction with an enormous amount of difference, but you have about half a million dollars here. This is, this is, this is, this is... It's not the amount, respectfully, Your Honor, it's not the amount of money that the Court should look at because an ordinary debt, it's the nature of the debt. If this debt, for example, I think the fund in this case is more akin to an insurance company. Some collective bargaining agreements say that the employees are going to get their benefits, their pension and health benefits through a multi-employer fund, like the fund in this case. Others say that they're going to get those annuity benefits or health insurance benefits through investment companies or through insurance companies. That's the position that the fund stands in this case. The fund, it has a debt that has its obligation or its genesis in the collective bargaining agreement. It's not a case where the employees are actually suffering directly. This is an ordinary debt and that's what Little John says. That's what the holding of Little John is and respectfully, to the extent that the fund is arguing that... To the extent you do a balancing, to the extent artistic furniture would say we have to balance here, you say that the balance should come down against the funds because they've got all this money out there anyway and their people aren't going to be hurt, right? The fund, the balancing, Judge Barry, does come down incorrectly in Rupert's view in artistic furniture. It's our position that artistic furniture was wrongly decided and that when you are balancing the equities and you look at the Polyus versus Clark equipment case, that's another Third Circuit case that involved whether or not a different type of ordinary debt, one that arose in a tort case to an injured worker, would the successor in that case be held liable for the predecessors manufacturing a defective crane? And in that case, the Third Circuit said, no, we are concerned with the fluidity of corporate assets and even though we had a sympathetic creditor in an injured worker, a person who had been injured by a crane, the court was not willing to deviate from the traditional common law rule and the traditional common law rule says that we have an ordinary debt and we're not going to apply a more expansive standard. You said just a moment ago that artistic furniture was wrongly decided. You didn't previously argue that, did you? In fact, didn't you proceed just as if artistic furniture was the applicable rule? Not before this court, but you're correct, Your Honor, that before Judge Irena's, the argument was assumed that artistic furniture would govern. And you're not serious? I have to concede that point. You're not going to argue, such as you did in your brief to us, that Ruberton did not know that Statewide had a debt to the funds before the asset purchase sale? Well, Your Honor, with respect to the notice issue, and I heard Your Honor earlier give me a warning, which sort of made me shake a little bit, Ruberton did know that Statewide faced a potential obligation for delinquent contributions. Statewide had an obligation. But we didn't know the exact amount, and we did not know that Einhorn would be looking to Ruberton for that debt. You did not know they would be looking to them, but you did know they could look to you. Well, that's a different question in their third-party claims, and that's a disputed issue of fact. Oh, I don't know about that. You knew there was a debt that Statewide owed to the funds, and you knew it was in the area of $385,000-plus. Well, now with fees and things like that, it's over a million, but the other, if I could, I know the red light is on. Could I make one more point? The point is, under the Golden State bottling line of cases, one of the rationales justifying deviating from the traditional common law rule is because they want to hold the successor to the terms of a collective bargaining agreement that was entered into by the predecessor. Here, that's not the case, and I think that it's important for the Court to keep in mind the distinction between the funds as an entity which have no privity of relationship in terms of collective bargaining agreement or any other contract with Statewide, or Ruberton, for that matter, versus the locals themselves, Local 676 of the Teamsters had the collective bargaining agreement, and that's a distinction. If someone's going to seek and say, we want to hold you to the collective bargaining agreement, it would have been the local. The local did not attempt to do so here. Instead, the local negotiated a new agreement. Thank you very much. Good morning, Your Honors. My name is David Kupfer. I represent the third-party defendants in the Appellees, Ronald Tobia. Hasn't that been stayed, the malpractice action been stayed? It has been stayed, Your Honor. We asked Judge Arenas to decide our motion for summary judgment and not to stay the action, and he entered a stay of that action, but I believe, as I will stick my head in the lion's mouth, as it were. Is that what you call us? Pardon? No. Could be all words. Could be, yes, could be a lot more. As I was preparing for this argument yesterday, it occurred to me that someone might raise the issue of what right do I have to be heard at all, even though neither the plaintiff nor... Judge Barry just raised it. I thought I was more delicate than that. I mean, I didn't say, why are you here? Thank you. I appreciate that. But why are you here? Well, Your Honor, because the theory of liability against my client is that if Rubidon is held liable as a successor to statewide, my client who represented Rubidon with respect to the transaction is liable for not having protected Rubidon's potential successor liability. Well, what could they have done that they didn't do? I mean, what's the claim that they could have done? Well, the claim is that my client either neglected to inform Rubidon of its potential successor liability or should have done more to try... Well, they knew about it. Well, I believe, I agree with you completely, Judge Barry. I believe the record reflects that they knew about it and it was provided for. Rubidon's principles contend that they were informed by my client that he had nothing to worry about. I never said they provided for it. I said they knew of it. I understand. I understand. Well, Your Honor asked me what is... But if it's a legal issue, then it falls wherever it is. I'm not sure... Well, we ought to ask... You're not really on the same side as Rubidon. I am in this sense, Your Honor. I would argue that if Rubidon, as a matter of law, is not liable as a successor to statewide, then as a matter of law, my client can't be liable for having failed to protect it from a non-existent liability. That's right. I think that's obvious. True enough as a result, but when we write an opinion in this case, we're not going to be dealing directly with any legal issue or for that matter, any right or obligation directly that affects your client. That is correct. Directly is correct, Your Honor. Indirectly, Your Honors, will because I would argue if the court upholds the decision of the district court and dismisses the complaint as to Rubidon, I would argue as a matter of law, my client has no liability and that would be the law of the case. Subsequent to Judge Arenas' decision, we sought leave and were granted leave to file supplemental briefing on our motion for summary judgment on the ground that the law of the case was now that Rubidon was not a successor as a matter of law, my client couldn't be liable. I'll try and keep my remarks short. I have five minutes. I'm sort of the tailwagon. Even less now. You had five minutes. I had five minutes. I agree. Let me address if I may a question that Your Honors raised with respect to filling in the gaps to try and affect the policies of ERISA. I think Judge Arenas didn't explicitly say why the policies of ERISA should apply to a delinquency by a participant in a pension fund to a successor but I think it was inferred which was... Well, there's a question whether it's a successor. I mean, that's really the bottom issue. Yeah. I completely agree, Judge. But I think that in given the facts of this case, the equities don't compel holding Rubidon to be the successor to statewide for this reason. The funds were also on notice of dependency of the sale. The funds sat at the table during the negotiation to try and settle the injunction of the sale and the funds settled their claims against statewide for statewide delinquencies and then ultimately couldn't collect them. So somehow we should hold it against the funds for engaging in the settlement process and ultimately amicably resolving it? No, no, absolutely not, Your Honor. But I think the point is the case law such as Golden State which has applied successor liability for the protection of workers is because the workers were otherwise without a remedy. They imposed successor liability for, for instance, unfair labor practices because there was no other way for the workers to have a remedy. In this case, the funds had a remedy. The funds had a cause of action against statewide. They had a cause of action against Rubidon which they pursued. Unfortunately, statewide turned out to be judgment-proof. I don't think the policies of RORSA, as Judge Arenas noted and as is referenced in the Littlejohn decision, this is a business that which just happens to have its genesis in an ERISA obligation. That doesn't compel the application of the policies of ERISA because ultimately the goal here is not the protection of an injured worker. It's the protection of a pension fund. I heard what you were saying, Judge Smith, and I completely agree. Someone has to pay the $500,000 shortfall. It's going to come out of someone's pocket. But the point is here the funds had a remedy. Unfortunately, they weren't able to collect on that remedy because they settled and they settled with someone that turned out to be judgment-proof. The equities are not the same. Thank you. Thank you very much. I think you have some revital left. Yes, yes. Mr. Sabatino, could I ask you a question? Putting one unfairly discharged worker to work with a successor company seems to me different than saying to a successor that someone else's debt, for lack of another word, of a million dollars should be paid. That's a million. No, it's now a million dollars I hear with everything that's accrued. Why shouldn't that trouble me? Well, Judge, because I agree that the remedy here is larger because the violation that the successor engaged in, in which the predecessor knew of, was more serious than just not hiring one employee. Having a half a million dollars in liability to funds, that's a pretty big damage to do to those employees. And so I would think that- But Rupert on didn't do it. What's that? They didn't do it. Statewide didn't do it. Statewide did it. Didn't do it. But Rupert bought statewide and knew statewide hadn't done it. What the assets are statewide. And didn't, and statewide, or somebody didn't insist that the papers provided that Rupert would undertake that responsibility. Right. And so that's why it's successor liability is the only way to get a remedy in this case. I mean, it's clear that statewide was judgment proof. It was clear that they have no remedies. They bought Rupert, they made a fortune on doing that. And as I say, $11.2 million in revenue the year after. You mean statewide? Statewide. 8.9 came from statewide. Rupert made a fortune. But they're judgment proof. Statewide has nothing left. They were out. They were out of, we. Statewide has nothing left, but the business that was purchased. The business, what business? Well, they bought. The assets were purchased. All assets. And also they had contacts by buying those assets. And by bringing those employees over, it made it possible for them to get the state of New Jersey highway work. Rupert took over some jobs that had been statewide. They took over many jobs. They took over 24 of 42. And they took over. They were awarded eight from the beginning. They took over 24 of 42 that were in the middle. And they kept doing this business forever, which had never been theirs to do before. They argue that it's not the same business, don't they? Well, they claim by saying that it's asphalt. But Judge Slobiter, the record when we cited this in the brief, that the attorney for statewide says that the asphalt, the paving business, had peaked in the 80s. And so that's really a straw man. But the paving is a small part of this. The paving is a very small part. Very small part of this. And if there were to be a remand, there may have to be a tweaking on the paving part of this. Well, I think those employees, the paving was pretty well done by the time that they did the sale. The paving was done, the records would say, by in the 80s and the 90s. I've had a hard time understanding how if you're doing highway construction, you can put up signs, you can put up guideposts, but you don't have to do a road. It's not a highway, a road. They don't do the road, but they put a sign up. The focus is on the employees. And we say with the employees, they have the same union, they have the same funds. The same supervisors, the same equipment. I think they say though that some of them left in a little while. A lot of them, most of them left within three months. They were all gone. They left in November and December from between October and December. Most of the employees went with them and they were gone within two, three months. The majority of them, correct? But then they were replaced. That bargaining unit was replaced. Yeah. And you see, that's the idea of a multi-employer plan and bargaining units. That bargaining unit has the personality. And those employees continued. They took over in that unit. And it was eight of nine that came over. I would say the employees, and you really only do it that second that you transfer. Fall River dying, even though they later lost their majority status. Once they made it at the point of the transition, it carries over. Okay. Okay. Thank you very much. I think the time is up. Thank you very much. We'll take this matter under advisement. And we will finish for the day with the arguments, not with the conferences. Yeah, I think we do.